DOMINIQUE N. WESTMORELAND, ESQ. (SBN 302606)
  E-mail: dwestmoreland@wml-law.com
YESHA H. PATEL, ESQ. (SBN 346747)
  E-mail: ypatel@wml-law.com
**THE WESTMORELAND LAW FIRM, P.C.**
609 Deep Valley Drive, Suite 200
Rolling Hills Estates, California 90274
Telephone No.: (424) 285-5362
Facsimile No.:  (424) 285-5825

Attorneys for Plaintiff,
RESMAC, INC.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| RESMAC, INC., a Florida corporation,<br><br>  Plaintiff,<br><br>OAKTREE FUNDING CORP., a Arizona corporation and DOES 1 through 25, inclusive,<br><br>  Defendants. | **Case No.:**<br><br>**COMPLAINT FOR:**<br><br>1. **Breach of Contract**<br>2. **Intentional Interference with Prospective Economic Relations**<br>3. **Intentional Interference with Contractual Relations**<br>4. **Negligent Interference with Prospective Economic Relations**<br>5. **False Promise**<br>6. **Unfair Competition**<br><br>  **<u>DEMAND FOR JURY TRIAL</u>** |

- 1 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff RESMAC, INC., who complains and alleges as follows:

## PARTIES

1.      Plaintiff RESMAC, INC. ("Plaintiff") is, and at all relevant times was, a mortgage originator and seller/servicer that originates and aggregates residential mortgage loans for whole-loan sale. Plaintiff was formed and incorporated in the State of Florida, and has its principal offices in Los Angeles County and conducts business within this District.

2.      Defendant OAKTREE FUNDING CORP. ("Oaktree") is, and at all relevant times was engaged in acquiring pools of residential mortgage loans through affiliated investment vehicles. Based on information and belief, Oaktree was formed and incorporated in the State of Arizona, and does business in Los Angeles County, California.

3.      The true names and capacities of DOES 1–25 are presently unknown to Plaintiff, who therefore sues these defendants by such fictitious names pursuant to Code of California Civil Procedure section 474. Plaintiff is informed and believe, and on that basis allege, that each of the defendants sued under fictitious names are in some manner responsible for the wrongs and damages alleged below, in so acting was functioning as the agent, servant, partner, and employee of the co-defendants, and in taking the actions mentioned below was acting within the course and scope of his or her or its authority as such agent, servant, partner and employee, with permission and consent of the co-defendants.

## JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000 exclusive of interest and costs, and complete diversity exists between Plaintiff and Defendants. Alternatively, the Court has supplemental jurisdiction over related claims under 28 U.S.C. § 1367.

5.      Venue is proper in the Central District of California under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including negotiations, communications, and the expected closing and funding logistics handled by Oaktree's capital-markets team located in Los Angeles County.

- 2 -

6.      Assignment to the Western Division is proper because a substantial part of the events occurred in Los Angeles County.

**FACTUAL ALLEGATIONS**

7.      In April 2022, Oaktree committed in writing to purchase a forward bulk pool of residential mortgage loans from Resmac with an aggregate principal balance of approximately $35 million, later increased to approximately $40 million. A copy of the contract is attached hereto as Exhibit A.

8.      The commitment was memorialized in a signed trade confirmation and a series of emails between Oaktree representatives (including Bill Parnell and Jon Epstein) and Plaintiff confirming the deal terms and expansion of the purchase amount.

9.      The parties agreed to a closing date of May 15, 2022. The structure was a forward bulk purchase: Plaintiff would continue to originate and warehouse conforming loans meeting Oaktree's eligibility criteria in anticipation of Oaktree's takeout at closing.

10.     Throughout April and May 2022, the parties were in regular communication to manage delivery pipelines and coordinate funding logistics.

11.     Oaktree confirmed it was showing the loans in its internal system and provided feedback on the bid tape, eligibility, and pipeline.

12.     As May 15 approached, Oaktree failed to perform.

13.     At Plaintiff's request, Oaktree provided a short extension to May 31, 2022, and further written assurances that the purchase would proceed.

14.     Despite the extension and assurances, Oaktree again failed to purchase the committed loans in full by May 31, 2022.

15.     Plaintiff financed its pipeline using a warehouse credit facility provided by NexBank.

16.     Plaintiff relied on Oaktree's contracted takeout to clear loans from the warehouse line of credit from NexBank consistent with the warehouse covenants.

17.     In late May 2022, NexBank notified Plaintiff it would no longer permit additional fundings under the Oaktree commitment without updated written assurance from Oaktree.

- 3 -

18.     Plaintiff obtained a revised Oaktree letter, but Oaktree still failed to fund the committed purchase.

19.     Oaktree's nonperformance left Plaintiff holding a large quantity of committed, sale-designated loans in warehouse, exposing Plaintiff to elevated carry costs and covenant risk.

20.     The resulting covenant violations led to NexBank's termination of the warehouse line and to litigation between NexBank and Plaintiff now pending in federal court.

21.     Oaktree's conduct foreseeably disrupted and damaged Plaintiff's economic relationships and contractual rights, including with NexBank, and caused out-of-pocket losses, price slippage, additional interest and fees, business interruption, reputational harm, and litigation expense.

**FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Against All Defendants)**

22.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

23.     In April 2022 the parties entered into a binding forward bulk purchase agreement for a pool of residential mortgage loans, initially approximately $35 million, later increased to approximately $40 million with a May 15, 2022 closing. See, Ex. A.

24.     The agreement was memorialized by a signed trade confirmation and confirming email communications.

25.     Plaintiff performed, or was excused from performing, all material obligations and conditions precedent, including originating and warehousing eligible loans, providing bid tapes and eligibility data, coordinating delivery logistics, and agreeing to an extension when Oaktree requested or accepted one.

26.     Oaktree failed to perform its obligation to purchase the committed loans by May 15, 2022, and again by the extended May 31, 2022 date, despite written assurances and the absence of any valid contractual excuse.

- 4 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

27.    As a direct and proximate result, Plaintiff suffered a multitude of damages including but not limited to: carry interest, fees, and penalties; diminished loan sale proceeds and market slippage; increased administrative and hedging costs; termination of warehouse capacity; lost profits; and litigation expenses relating to the NexBank dispute.

28.    Plaintiff is entitled to expectation, consequential, and incidental damages amounting to a minimum of $30,000,000.

## SECOND CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
### (Against All Defendants)

29.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

30.    Plaintiff maintained ongoing and prospective economic relationships that probably would have resulted in future economic benefits, including but not limited to its warehouse financing and credit accommodations with NexBank and its financing and takeout relationships with other lenders, investors, and buyers of whole-loan pools.

31.    Oaktree knew of these relationships and their economic importance to Plaintiff.

32.    At a minimum, Oaktree knew of Plaintiff's reliance on warehouse capacity for pipeline aggregation and that Oaktree's takeout was the contemplated and disclosed source of pay-down on the warehouse line.

33.    Oaktree intentionally engaged in acts designed to disrupt these relationships, including issuing written assurances and agreeing to extensions while, on information and belief, lacking the present intent or ability to consummate the purchase as promised.

34.    Such false promises and misrepresentations constitute independently wrongful conduct beyond mere contract breach.

35.    Oaktree's conduct actually disrupted Plaintiff's economic relationships, including with NexBank, which curtailed and then terminated Plaintiff's warehouse capacity based on Oaktree's nonperformance.

- 5 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

36.     Oaktree's conduct was a substantial factor in causing Plaintiff economic harm, including the damages set forth above.

37.     As a direct and proximate result, Plaintiff suffered a multitude of damages including but not limited to: carry interest, fees, and penalties; diminished loan sale proceeds and market slippage; increased administrative and hedging costs; termination of warehouse capacity; lost profits; and litigation expenses relating to the NexBank dispute.

38.     Plaintiff is entitled to expectation, consequential, and incidental damages amounting to a minimum of $30,000,000.

39.     The conduct of (or lack thereof) Oaktree was cruel, unjust, malicious, fraudulent, oppressive, and intended to cause injury to Plaintiff, and/or grossly negligent so to know that its conduct would adversely impact Plaintiff. Oaktree is therefore liable for punitive damages under California Civil Code § 3294, and as otherwise permitted by law.

### THIRD CAUSE OF ACTION
### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against All Defendants)

40.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

41.     Plaintiff had a valid, enforceable warehouse lending agreement with NexBank.

42.     Oaktree knew of the NexBank agreement and its material terms, including the need for timely takeout to comply with borrowing-base/covenant requirements. Oaktree's provision of updated assurance letters was in direct response to NexBank's demands tied to that contract.

43.     Oaktree intentionally failed to perform its committed purchase and delivered shifting assurances knowing such conduct would disrupt (or was substantially certain to disrupt) Plaintiff's performance under the NexBank contract.

44.     Oaktree's conduct caused actual disruption of Plaintiff's performance and contributed to NexBank's termination of the warehouse facility.

- 6 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

45.     Oaktree's conduct was a substantial factor in causing Plaintiff economic harm, including the damages set forth above.

46.     As a direct and proximate result, Plaintiff suffered a multitude of damages including but not limited to: carry interest, fees, and penalties; diminished loan sale proceeds and market slippage; increased administrative and hedging costs; termination of warehouse capacity; lost profits; and litigation expenses relating to the NexBank dispute.

47.     Plaintiff is entitled to expectation, consequential, and incidental damages amounting to a minimum of $30,000,000.

48.     The conduct of (or lack thereof) Oaktree was cruel, unjust, malicious, fraudulent, oppressive, and intended to cause injury to Plaintiff, and/or grossly negligent so to know that its conduct would adversely impact Plaintiff. Oaktree is therefore liable for punitive damages under California Civil Code § 3294, and as otherwise permitted by law.

## FOURTH CAUSE OF ACTION

## NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

### (Against All Defendants)

49.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

50.     Plaintiff had an economic relationship with NexBank and other market counterparties that probably would have resulted in future economic benefits.

51.     Oaktree knew or should have known of these relationships and that a failure to use reasonable care in managing its committed closing, communications, and pipeline logistics would foreseeably interfere with those relationships.

52.     Oaktree failed to exercise reasonable care in planning and executing the committed purchase, in providing timely and accurate confirmations, and in avoiding foreseeable disruption to Plaintiff's warehouse and takeout arrangements.

53.     Oaktree's negligence actually disrupted Plaintiff's economic relationships and was a substantial factor in causing the damages described above.

- 7 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

54.     Oaktree's conduct was a substantial factor in causing Plaintiff economic harm, including the damages set forth above.

55.     As a direct and proximate result, Plaintiff suffered a multitude of damages including but not limited to: carry interest, fees, and penalties; diminished loan sale proceeds and market slippage; increased administrative and hedging costs; termination of warehouse capacity; lost profits; and litigation expenses relating to the NexBank dispute.

56.     Plaintiff is entitled to expectation, consequential, and incidental damages amounting to a minimum of $30,000,000.

## FIFTH CAUSE OF ACTION
## FALSE PROMISE
### (Against All Defendants)

57.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

58.     Plaintiff maintained ongoing and prospective economic relationships that probably would have resulted in future economic benefits, including but not limited to its warehouse financing and credit accommodations with NexBank and its financing and takeout relationships with other lenders, investors, and buyers of whole-loan pools.

59.     Oaktree knew of these relationships and their economic importance to Plaintiff.

60.     At a minimum, Oaktree knew of Plaintiff's reliance on warehouse capacity for pipeline aggregation and that Oaktree's takeout was the contemplated and disclosed source of pay-down on the warehouse line.

61.     Oaktree intentionally engaged in acts designed to disrupt these relationships, including issuing written assurances and agreeing to extensions while, on information and belief, lacking the present intent or ability to consummate the purchase as promised.

62.     Such false promises and misrepresentations constitute independently wrongful conduct beyond mere contract breach.

- 8 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

63.    Oaktree's conduct actually disrupted Plaintiff's economic relationships, including with NexBank, which curtailed and then terminated Plaintiff's warehouse capacity based on Oaktree's nonperformance.

64.    Oaktree's conduct was a substantial factor in causing Plaintiff economic harm, including the damages set forth above.

65.    As a direct and proximate result, Plaintiff suffered a multitude of damages including but not limited to: carry interest, fees, and penalties; diminished loan sale proceeds and market slippage; increased administrative and hedging costs; termination of warehouse capacity; lost profits; and litigation expenses relating to the NexBank dispute.

66.    Plaintiff is entitled to expectation, consequential, and incidental damages amounting to a minimum of $30,000,000.

67.    The conduct of (or lack thereof) Oaktree was cruel, unjust, malicious, fraudulent, oppressive, and intended to cause injury to Plaintiff, and/or grossly negligent so to know that its conduct would adversely impact Plaintiff. Oaktree is therefore liable for punitive damages under California Civil Code § 3294, and as otherwise permitted by law.

## SIXTH CAUSE OF ACTION
## UNFAIR COMPETITION
### (Against All Defendants)

68.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.    Defendants have engaged in unlawful, unfair, and fraudulent business acts and practices within the meaning of Business and Professions Code section 17200 et seq. (the "UCL").

70.    Defendants' acts are unlawful because they constitute, among other things, breaches of contract, breaches of fiduciary duty, and intentional and negligent interference with prospective economic advantage, all as alleged above.

71.    Defendants' acts are unfair because they offend established public policy, are immoral, unethical, and unscrupulous, and cause substantial injury to Plaintiff that is

- 9 -

not outweighed by any benefits to consumers or competition. Defendants leveraged their control over Plaintiff's confidential data to misappropriate Plaintiff's clients and disrupt Plaintiff's business.

72.    Defendants' acts are fraudulent because they made misrepresentations and omissions likely to deceive reasonable consumers and business partners.

73.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent practices, Plaintiff has lost money and property in the form of lost clients, lost revenues, and lost goodwill, and has been forced to expend resources responding to client confusion and repairing its business relationships.

74.    Plaintiff seeks restitution, disgorgement of all ill-gotten gains and benefits obtained by Defendants through their unfair competition, and injunctive relief restraining Defendants from further unauthorized use or disclosure of Plaintiff's data and further unfair competition.

75.    Defendants' conduct was malicious, oppressive, and fraudulent, and Plaintiff therefore seeks punitive damages in addition to restitution and injunctive relief to the fullest extent permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants and each of them for all of the above-alleged causes of action, as follows:

1.    For Expectation, consequential, and incidental at minimum $30,000,000;

2.    Punitive / exemplary damages pursuant to Cal. Civ. Code § 3294;

3.    For attorney's fees, pursuant Cal. Civ. Code § 1717;

4.    For pre-judgment interest as provided by law pursuant to Cal. Civ. Code §§ 3287 and 3288;

5.    For costs of suit incurred herein; and

6.    For such other and further relief as the Court deems fair and just.

///

///

///

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Dated: November 11, 2025                    THE WESTMORELAND LAW FIRM, P.C.

                                                    /s/ Dominique N. Westmoreland
                                          By: _____
                                                Dominique N. Westmoreland
                                                Yesha H. Patel
                                                Attorneys for Plaintiff,
                                                RESMAC, INC.

- 11 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**EXHIBIT A**

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

# Oaktree Funding Corporation

## CORRESPONDENT MORTGAGE PURCHASE AGREEMENT

This Agreement, entered into this __3rd__ day of __May__, __2022__, by and between Oaktree Funding Corp. (herein after referred to as "Oaktree Funding"), having their principal mortgage banking office located at 1298 West 7th Street, Upland, CA 91786 NMLS#71640, and __Resmac Inc.__ (herein after referred to as "Seller") having its principal office located at __398 NE 6th Ave, Suite B, Delray Beach, FL 33483__

From time to time pursuant to this Agreement, Seller shall sell and OAKTREE FUNDING shall buy mortgage loans on residential real estate (hereinafter collectively called the "Mortgage Loans" and individually a "Mortgage Loan"). This Agreement shall govern the sale and transfer of such Mortgage Loans by Seller to OAKTREE FUNDING and each such Mortgage Loan shall be subject to the warranties, representations, and agreements set forth herein, subject, however, to the terms and conditions of any separate written offering or commitment letters applying to the Mortgage Loans.

All future purchases of Mortgage Loans by OAKTREE FUNDING shall be governed by the terms contained herein unless the parties shall agree in writing before or at the time such purchases are made. The purchase price and any servicing release premium paid for each Mortgage Loan shall be established by written agreement between the parties. The terms and conditions of any separate offering or commitment letter signed by the parties hereto and pursuant to which OAKTREE FUNDING shall agree to buy and Seller shall agree to sell any Mortgage Loan shall survive and be deemed to be a part of this Agreement. In this Agreement, the term "Buyer" shall refer to OAKTREE FUNDING. This Agreement, and any and all representations, warranties, or covenants of Seller hereunder, may be enforced against Seller by OAKTREE FUNDING and/or their successors and assigns.

1. **LOANS ELIGIBLE FOR PURCHASE:** Seller may offer for sale to Buyer eligible VA, FHA, RHS, or Conventional Mortgage Loans. All such Mortgage Loans shall be sold with servicing released to Buyer. All such Mortgage Loans shall be originated and closed according to standard agency regulations as established, and amended from time to time, by the Federal National Mortgage Association (FNMA), the Federal Home Loan Mortgage Corporation (FHLMC), the Government National Mortgage Association (GNMA), the Federal Housing Administration (FHA), the Veterans Administration (VA), and/or the US Department of Agriculture Rural Housing Service (RHS), formerly Farmers Home Administration (FmHA). It is hereby understood and agreed, for purposes of this Agreement, that the aforementioned standard agency regulations are incorporated in and made a part hereof. All Mortgage Loans offered by Seller must be secured by residential first and second lien mortgages or deeds of trust. Seller shall be responsible for ensuring the compliance of Mortgage Loans sold hereunder with the applicable agency regulations which may exist at the time of purchase.

   Any Loans specifically identified as being non-agency, shall be originated and closed in accordance with the specifications as outlined in the Correspondent Lending Manual.

2. **PAYMENT FOR LOANS:** Payment for Loans will be made following receipt and review of closing documentation, including evidence of compliance with underwriting requirements, FHA, VA and/or RHS requirements, rules and regulations, as well as all Federal and State statutes, rules and regulations, including but not limited to the Federal Truth-In-Lending Act, the Equal Credit Opportunity Act, the Fair Housing Act and the Real Estate Settlement Procedures Act. Payment for Loans will be made via the Federal Reserve Wire Transfer System to the party directed by the Seller. Any amounts collected by Seller for maintenance or improvements to the property, for the escrow of taxes or insurance not yet due, or for other reserves shall be deducted from the wire amount.

3. **DELIVERY OF DOCUMENTS:** Seller agrees to do all acts necessary to perfect title to the Mortgage Loans to Buyer and shall sell, assign and deliver to Buyer, with respect to the purchase of each such Mortgage Loan, the documents set forth in the Correspondent Lending Manual, all subject to the approval of Buyer and its legal counsel as to proper form and execution. No later than ninety (90) days from the date of purchase Seller shall deliver to Buyer the required final documentation. Should Seller fail to satisfy, within the aforesaid ninety (90) days, the requirements for document delivery with respect to any Mortgage Loan purchased, Buyer reserves the right to withhold service release premiums on subsequent Mortgage Loan purchases if required documentation is not received in a timely manner. Buyer's right to withhold payment of service release premiums shall be in addition to and not in lieu of Buyer's other remedies hereunder including the remedy of repurchase as provided in Paragraph 7 hereof.

4. **GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER:**
Seller hereby represents, warrants, and covenants as follows:

a) Seller is and will continue to be duly organized, validly existing, and in good standing under the laws of the jurisdiction in which it was incorporated or organized, as applicable, and has and will continue to maintain all licenses, registrations, and certifications necessary to carry on its business as now being conducted, and is and will continue to be licensed, registered, qualified, and in good standing in each state where property securing a Mortgage Loan is located if the laws of such state require licensing, registration or qualification in order to conduct business of the type conducted by Seller; and

b) Seller has and will maintain the full corporate or partnership power and authority to execute and deliver the documents contemplated by this Agreement and to perform in accordance with each of the terms thereof and the terms of the Correspondent Manual. The execution, delivery and performance of this Agreement by Seller and the consummation of the transactions contemplated hereby have been duly and validly authorized. This Agreement is a legal, valid, binding and enforceable obligation of Seller, and all requisite corporate or partnership action has been taken by Seller to make this Agreement valid and binding upon Seller and enforceable in accordance with its terms; and

c) Seller has the ability to perform each and every obligation and/or requirement imposed on Seller pursuant to this Agreement, and no offset, counterclaim, or defense exists to the full performance by Seller of the requirements of this Agreement; and

d) Neither the Correspondent Application, this Agreement, nor any statement, report or other document furnished or to be furnished by Seller pursuant to this Agreement contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading; and

e) Seller has complied with, and has not violated any law, ordinance, requirement, regulation, rule or other order applicable to its business or properties, the violation of which might adversely affect the operations or financial condition of Seller to consummate the transactions contemplated by this Agreement; and

f) All financial statements required to be submitted by Seller to Buyer have been prepared in accordance with Generally Accepted Accounting Practices applied on a consistent basis by an independent Certified Accountant or other individual acceptable to Buyer; and

g) Seller has established procedures with respect to real estate appraisers and appraisals in accordance with the requirements described in the Correspondent Manual, and Title IX of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") and implementing regulations, Seller maintains a list of approved appraisers (the "Approved Appraisers") who satisfy the Buyer's standards for appraiser independence as set forth in the Correspondent Manual, and Seller shall, upon Buyer's request, provide Buyer with any information Seller has in its possession regarding any appraiser or appraisal; and

h) Seller shall at all times comply with all federal, state, and local laws, regulations, and/or ordinances applicable to it and, in particular, but without limitation, shall not, at any time, (i) discourage or dissuade any person from applying for a Mortgage Loan (ii) offer or negotiate different interest rates or terms, or (iii) treat any applicant or potential applicant differently, on the basis of that person's race, sex, religion, national origin, age, color, disability, or marital status; or the fact that the person derives all or part of his/her income from any public assistance program; or the fact that the person has in good faith exercised any right under the Federal Consumer Credit Protection Act or any state anti-discrimination law; or based upon any other characteristic of the person which is defined to be a prohibited basis for credit discrimination under any state or federal law or regulation.

## SELLER'S REPRESENTATIONS, WARRANTIES, AND COVENANTS REGARDING MORTGAGE LOANS

With respect to every Mortgage Loan offered by Seller to Buyer hereunder, Seller represents, warrants, and covenants as follows:

a) The security agreement, deed of trust or other document securing the Mortgage Loan (the "Mortgage") has been executed, on the date stated in the Mortgage (the "Closing Date") by any and all person(s) necessary to create and convey a valid and legally enforceable first lien obligation in favor of the Seller with respect to the Mortgage Note that is superior to all other liens or other claims, and the note evidencing the Mortgage Loan (the "Mortgage Note") is payable to Seller as payee and has been duly executed by the person or person(s) (the "Mortgagor", whether one or more) to whom, or for whose benefit, Seller has disbursed the entire proceeds of the Mortgage Note and who is/are the true and actual person(s) who submitted an application to Seller and who have been approved by Seller and/or Buyer to receive the Mortgage Loan represented by the Mortgage Note and Mortgage; and

b) The sale of the Mortgage Loan is in Seller's ordinary course of business and will not result in (i) the breach of any term or provision of Seller's charter or bylaws, (ii) the breach of any term or provision of, or conflict with or constitute a default of or result in the acceleration of any obligation under any agreement, indenture, loan or credit agreement, or other instrument to which Seller or any of its property is subject, or (iii) the violation of any law, rule, regulation, order, judgment, or decree to which Seller or any of its property is subject; and

c) The entire proceeds of the Mortgage Loan was used by the Mortgagor to finance or refinance the purchase or initial construction of the one to four family residential dwelling permanently affixed to that real property described in the Mortgage (the "Mortgaged Property"), and the Mortgaged Property is or will be used by the Mortgagor as his/her/their principal or secondary residence or for such other purpose as is permitted by investor guidelines or under the Correspondent Lending Manual; and

d) The Mortgage contains enforceable provisions that give the Mortgage holder rights and remedies to realize against the Mortgaged Property as expeditiously as applicable law allows, including, without limitation, the power of sale; and

e) Seller has good and merchantable title to the Mortgage Loan as of the Closing Date and the assignment of the Mortgage Loan from Seller to Buyer is valid, sufficient, enforceable and conveys good title to such Mortgage Loan to Buyer, free and clear of any liens, claims, or encumbrances upon such Mortgage Loan; and Seller has not affected any assignment, sale or hypothecation of the Mortgage Loan, except in favor of Buyer; and

f) Seller will execute and deliver to Buyer all instruments necessary to convey to Buyer all rights, titles and interests in and to each Loan and all documents evidencing insuring, guaranteeing or securing each Loan; and

g) All taxes and governmental assessments that became due and owing prior to the Closing Date in respect to the Mortgaged Property have been paid; and

h) An escrow of funds in an amount sufficient, in accordance with industry standards or any applicable HUD regulations, to cover a portion of one (1) calendar year's payments of taxes and governmental assessments, hazard insurance and, if applicable, mortgage insurance premiums or guaranty fees on the Mortgaged Property, has been established; and

i) The unpaid principal balance of the Mortgage Loan is as stated; no part of the Mortgaged Property has been released from the lien securing each Loan; the terms of the Loan have in no way been changed or modified; and the Loan is current and not in default and no condition or circumstance exists that, with the passage of time, would constitute a default; and

j) Seller is the sole owner of each Mortgage Loan to be sold under this Agreement and has the requisite power and authority to sell, transfer, and assign such Mortgage Loan on the terms herein set forth, free and clear of all liens, claims and encumbrances upon such Mortgage Loan; and

k) Each Mortgage Loan is of acceptable quality and is eligible for sale to the Federal National Mortgage Association, Government National Mortgage Association, Federal Home Loan Mortgage Corporation, or non-conforming (Jumbo) Investor whose Mortgage Loan eligibility specifications are outlined in the Correspondent Manual and whose decision regarding acceptable quality and eligibility is determinative; and

l) No predatory or deceptive lending practices, including but not limited to the extension of credit without regard for the Mortgagor's ability to repay the Mortgage Loan, and/or the extension of credit which has no apparent benefit to the Mortgagor were employed in connection with the Mortgage Loan application. Each Mortgage Loan application is in compliance with the anti-predatory lending eligibility requirements of the Correspondent Manual and all applicable agency's or investor's rules and regulations; and

m) The Mortgage Loan was properly closed in accordance with the requirements of the Correspondent Manual, and all applicable agencies rules and regulations as determined by OAKTREE FUNDING and/or the applicable agency. The Mortgage Loan complies, as determined by OAKTREE FUNDING and/or the applicable agency, with all applicable federal and state laws, rules, and regulations, as from time to time amended, including but not limited to the following: all applicable safety and soundness regulatory standards governing national banks, applicable usury limitations, the applicable laws and regulations governing lending, federal, state and local predatory lending and unfair and deceptive practices laws, Home Ownership Equity and Protection Act, Bank Secrecy Act, Anti Money Laundering regulations, the Real Estate Settlement Procedures Act, the Equal Credit Opportunity Act, the Flood Disaster Protection Act, the Fair Housing Act, the Truth-in-Lending Act of 1968, the Depository Institutions Deregulation and Monetary Control Act of 1980, the Garn-St. Germain Depository Institutions Act of 1982 and all applicable regulations issued pursuant thereto; and that all conditions as to the validity, transferability and continuation of any FHA Insurance Contract, VA Loan Guaranty Certificate, or RHS Loan Note Guaranty if any, as required by the National Housing Act of 1934, the Servicemen's Readjustment Act of 1944, as amended, or the Cranston-Gonzales National Affordable Housing Act of 1990, and the rules and regulations there under, or by the FHA, VA or RHS have been properly satisfied, and said FHA Insurance Contract, FHA Commitment, VA Loan Guaranty Certificate or right to obtain a VA Loan Guaranty Certificate, or RHS Loan Note Guaranty, on each Mortgage Loan will be valid and enforceable by Buyer; and

n) The Mortgagor has duly executed and delivered appropriate evidence indicating that the Mortgagor has received any and all disclosure materials as required by applicable law and regulations; and

o) The full original principal amount of each Mortgage Loan has been advanced to the Mortgagor, either by direct payment, or by payment made on the Mortgagor's request or approval; and all costs, fees, and expenses incurred in making, closing and recording the Mortgage Loan, have been paid; and

p) There is in force a paid-up Mortgagee Policy of Title Insurance on the Mortgage Loan in an amount not less than the outstanding principal balance of the Loan, affirming that the Mortgagor has fee simple, indefeasible title to the Mortgaged Property and insuring the validity and priority of Seller's first lien securing the Mortgage Loan, and such Mortgagee Policy of Title Insurance does not contain any

exceptions to or defects in title not otherwise disclosed to and approved in advance by Buyer in writing; and

q) There is a valid paid-up hazard insurance policy in force, at the time of the purchase of the Mortgage Loan by Buyer issued or written by an insurance company with a Best's Key Rating Guide financial size category of Class III or better, in an amount equal to at least the full replacement value of the improvements on the property secured by the Mortgage. The policy shall be of a type at least as protective as fire and extended coverage and shall contain a mortgagee clause and loss payable clause to the Buyer in the form of the standard mortgage clause which clause shall protect the mortgagee's interest in the insured property separate and apart from the mortgagor's interest in order that the mortgagee shall not subject to any act, neglect, omission or misrepresentation of the insured which might void or breach coverage under the policy. Also, the policy shall contain suitable provisions for payment on all present and future mortgages on such premises in order of precedence. For properties in a special flood hazard area, there is in force a paid-up flood insurance policy. For properties located in a condominium or PUD project, Seller will provide a certificate of insurance naming Buyer as the insured plus a certified true copy of the Master Hazard and Liability Policy; and

r) All documents submitted or delivered are genuine, and all other representations as to each Mortgage Loan sold are true and correct and meet the requirements and specifications of all parts of this Agreement and the Correspondent Manual; and

s) The Mortgage, Mortgage Note, and all other Mortgage Loan documents executed by the Mortgagor create legal, valid and binding obligations of the Mortgagor, enforceable in accordance with their terms, there exists as of the Closing Date no right of offset, defense, right of rescission, homestead right, or counterclaim with respect to the Mortgage Note or any of the other documents, and there is no pending or threatened litigation that might affect the validity or enforceability of the Mortgage Note or the Mortgage; and

t) The Mortgaged Property is either free of damage and in good repair or the proceeds of the Mortgage Loan will be used to purchase and rehabilitate the Mortgaged Property, there is no proceeding pending or threatened for a partial or total condemnation or partition of the Mortgaged Property, and either there are no mechanic's or similar liens or claims that have been filed for work, labor or material (and no rights are outstanding that under applicable law could give rise to such a lien or claim) affecting the Mortgaged Property or such liens and claims have been insured against under the final Mortgagee Policy of Title Insurance; and

u) As of the Closing Date, to the best of Seller's knowledge, after reasonable inspection, the mortgaged property was not affected by any condition arising from the presence of any dangerous, toxic or hazardous pollutants, chemicals, wastes, or substances; and

v) All improvements on the Mortgaged Property, including new construction, have been or will be completed in full compliance with any applicable laws, regulations, or building codes and standards, and that the improvements comply with the laws, regulations, or building codes and standards in effect; and

w) With respect to each appraisal delivered to Buyer in connection with a prospective Mortgage Loan, the appraisal has been prepared by an Approved Appraiser, Seller has reviewed the appraisal and found the appraisal acceptable in accordance with the standards set forth in the Correspondent Manual, and Seller shall, upon Buyer's request, provide Buyer with any information Seller has in its possession regarding the appraiser or appraisal; and

x) In addition to those representations, warranties, and covenants specifically set forth above, Seller makes all representations, warranties, and covenants expressed by Seller to Buyer orally or in writing with respect to any particular Mortgage Loan, and expressly makes any and all additional representations, warranties, or covenants that are normally or customarily made in connection with a mortgage loan of the same type and terms as the Mortgage Loan; and

y) None of the Mortgage Loans is (i) subject to, covered by or in violation of the Home Ownership and Equity Protection Act of 1994 ("HOEPA") or (ii) classified as "high cost", "covered", "high risk home", "threshold", or "predatory" loans under any other applicable state, federal or local law, including any predatory or abusive lending laws (or similarly classified loans using different terminology under a law imposing heightened scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees) or (iii) in violation of any state law or ordinance comparable to HOEPA; and

z) Each Mortgage Loan is in compliance with the "Ability to Repay and Qualified Mortgage" standards promulgated by the Consumer Financial Protection Bureau and set forth in 12 CFR 1026.43 (the "ATR Rule"), and each Mortgage Loan is a "Qualified Mortgage" as this term is defined in 12 CFR 1026.43(e) of the ATR Rule.

**4a. OAKTREE FUNDING CORRESPONDENT SELLER GUIDE**

Unless the context otherwise requires, all capitalized terms used and not otherwise defined in the Agreement shall have ,the: meanings assigned to such terms in the OAKTREE FUNDING Correspondent Lending Manual Seller Guide, as amended and supplemented from time to time. The parties expressly understand and agree that the Correspondent Lending Manual is hereby incorporated into this MLPA by reference and forms a critical and inseparable part hereof. Seller also expressly understands and agrees that OAKTREE FUNDING reserves the right to amend or supplement the Correspondent Lending Manual at any time and from time to time in its sole and absolute discretion. OAKTREE FUNDING shall furnish Seller with any such amendments or supplements by posting such amendments or supplements on OAKTREE FUNDINGS' Correspondent website, which shall become effective immediately or on such later date as OAKTREE FUNDING may determine in its sole discretion, and the sale and purchase of each Mortgage Loan hereunder shall be subject to all requirements of the Correspondent Lending Manual, as in effect on the related Purchase Date. For the avoidance of doubt, no acknowledgment or approval of Seller is necessary for any such amendments or supplements to become effective.

5. **REPURCHASE OF LOANS:** Seller hereby agrees to repurchase any Mortgage Loan sold to Buyer at any time upon the occurrence of any of the following events:

a) Any false statement, misstatement, or act of omission of material fact contained in the Mortgage Loan documentation resulting from Seller's negligence or failure to exercise due diligence as disclosed by actual inspection by Buyer or its representative, or otherwise disclosed; or

b) Seller fails to obtain FHA insurance, VA or RHS guaranty, private mortgage insurance, or if such insurance or guaranty lapses or for any reason becomes unavailable, as a result of any negligent act or omission by Seller, or the failure by Seller to obtain such insurance or guaranty within ninety (30) days from the date of purchase; or

c) Buyer is required to repurchase any Loan sold by it to GNMA, FNMA, FHLMC, or any other investor, because the investor, GNMA, FNMA, or FHLMC determined that the loan is not of acceptable quality or was ineligible for purchase as a result of a violation of the investor, GNMA, FNMA, FHLMC, or OAKTREE FUNDING's Seller/Servicer Guide and/or Correspondent Manual; or

d) Any representation or warranty made by Seller under this Agreement or the Correspondent Manual with respect to any Mortgage Loan shall, in the reasonable opinion of Buyer, be, in whole or in part and with or without knowledge of Seller, false at the time when made by Seller or become false upon the occurrence of subsequent events; or

e) Any fraud, misrepresentation or act of omission with respect to the information submitted on a particular Mortgage Loan is determined to exist by Buyer or another investor. This includes, but is not limited to, Mortgagor or other third party fraud or misrepresentation, and any misrepresentation of Mortgagor's income, funds on deposit, or employment, or of the occupancy status of the Mortgaged Property; or

 f) Seller's breach of any covenant or obligation to Buyer with respect to the Mortgage Loan under this Agreement or the Correspondent Manual, specifically including, without limitation, Seller's obligations under Section 3,4, or 5 hereof.

The repurchase price for any Mortgage Loan that Seller is required to repurchase from Buyer shall be an amount equal to its then unpaid principal balance of the Mortgage Loan on the date of repurchase, plus accrued interest, any servicing release premium paid, and direct expenses (including attorney's fees) incurred by Buyer for any actions taken by it concerning, as a result of, or in connection with, any of the events or circumstances set forth herein as cause for repurchase. Buyer's exercise of its right to have Seller repurchase any Mortgage Loan hereunder shall be in addition to, and not in lieu of, any other rights or remedies which Buyer may have against Seller hereunder or under applicable law. All rights and remedies provided in this MLPA and the Guide are cumulative and not exclusive of any other rights or remedies that may be available to the parties, whether provided by law, in equity or otherwise.

**6. INDEMNIFICATION:** Seller shall protect, indemnify, and hold Buyer harmless from and in respect to, any and all losses, liabilities, reasonable costs, and expenses, including attorneys' fees that may be incurred by Buyer with respect to, or proximately resulting from any breach of any representation, warranty, or covenant of Seller hereunder. Seller shall protect, indemnify, and hold Buyer harmless from and in respect to, any and all losses, liabilities, reasonable costs, and expenses, including attorneys' fees that may be incurred by Buyer with respect to Seller's refusal to repurchase a loan that GNMA, FNMA, FHLMC, or any other investor has determined to be ineligible for purchase or not of acceptable quality. Buyer shall be entitled to rely upon Seller as assembler and preparer of all Mortgage Loan documents, and is under no duty whatsoever to investigate or confirm any of the information set forth therein as to its honesty, accuracy, or completeness. Seller hereby agrees to indemnify and hold Buyer harmless from any claim, loss or other damage to Buyer including reasonable attorney's fees resulting in whole or in part from any inaccuracy or incompleteness in the Mortgage Loan documents or any act or omission by Seller, its agents and employees, including but not limited to failure to comply with applicable state, federal and local statutes or regulations. To the extent Seller, its agents or employees, commits an actual wrong, or makes some error or omission in the preparation of any Mortgage Loan or its documents and as a result thereof, and based thereon, Buyer commits an act or omission for which it becomes liable to the Mortgage(s) or any third party and/or a claim or cause of action is instituted against Buyer, Seller shall and hereby agrees to indemnify and hold Buyer harmless from any such loss or damage, including reasonable attorney's fees, resulting there from. In the event Oaktree Funding makes a demand on Seller for Indemnifications Seller herby agrees that the legal time frame shall begin as of the date of notification to Seller.

**7. MARI and MIDEX Release:** Seller understands that Buyer performs quality control reviews of the Mortgage Loans that Seller submits to Buyer for purchase. Seller hereby consents to the release of information about any loan application that is believed to contain misrepresentations and/or irregularities. Seller agrees and gives its consent that it and its employees may be named as the originating entity or loan officers on such loans, whether or not Seller or its employees are implicated in the misrepresentations and/or irregularities. Seller hereby releases and agrees to hold harmless Buyer, Mortgage Asset Research Institute, Inc. ("MARI"), all Mortgage Industry Data Exchange ("MIDEX") subscribers, and any trade associations that endorse the MIDEX system from any and all liability for damages, losses, costs, and expenses that may arise from the reporting or use of any information submitted by Buyer or any other MIDEX subscriber to MARI, recorded in the MIDEX system, and used in any way by Buyer or any other MIDEX subscriber

**8. REFUND OF SERVICE RELEASE PREMIUMS:**
Please review section 5 of the Oaktree Funding Sellers Guide for premium recapture covenants.

**9. NOTICES:** Any notice provided for herein shall be sufficient if sent by first class United States mail, postage prepaid, addressed as follows:

If to Buyer: Oaktree Funding Corporation
1298 West 7th Street
Upland, CA 9178
NMLS:71640

If to Seller: Resmac Inc.

4141 S Nogales Street, C102

West Covina, CA 91792

Attention

Either party may change its address for purposes hereof by giving notice to the other party.

**10. FINANCIAL STATEMENTS AND RIGHT TO AUDIT:** Seller agrees to provide annual audited financial statements (including balance sheet, statements of income and expenses, cash flow statements, Report of Compliance with Specific Requirements Applicable to HUD Program Transactions, Report on the Internal Control Structure and Computation of Compliance with FHA Net Worth Requirements), to Buyer within ninety (90) days after the close of its fiscal year prepared by independent certified public accountants in accordance with generally accepted accounting principles. Seller will also submit copies of current Mortgage Licenses (where applicable) and a copy of a current Fidelity Bond and E & O Insurance Policy. If Buyer is the Sponsor of the Seller under the FHA Loan Correspondent program, Seller agrees to allow Buyer access to their office facilities and loan records during normal business hours for an on-site compliance audit in accordance with HUD quality control requirements.

**12. INSURANCE:** Seller shall maintain in full force Errors and Omissions Insurance and a Fidelity Bond, Mortgage Banker Bond or Mortgage Originator Policy in such amounts as required by HUD or as Buyer may reasonably require indemnifying it from any loss or damage incurred in connection with this Agreement. Buyer must be named as a "loss payee" and shall have the right to file a claim directly with the insurer if Seller fails to file a claim for a covered loss that Buyer incurs. The insurer must agree to notify Buyer at least 30 days before it cancels, reduces or modifies the Seller's coverage for any reason or within 10 days after it receives a request from Seller to cancel or reduce any coverage.

**13. RELATIONSHIP OF THE PARTIES:** Buyer and Seller hereby agree that neither this Agreement nor any purchase of Mortgage Loans pursuant hereto shall constitute any agency relationship, legal representation, joint venture, partnership or employment. Buyer and Seller agree that neither party is in any way authorized to make any contract, agreement, warranty, or representation, or to create any obligation, express or implied, on behalf of the other.

**14. EVENTS OF DEFAULT:** Each of the following shall constitute an Event of Default on the part of Seller under this Agreement: (i) any breach by Seller of any of Seller's representations, warranties, or covenants set forth in this Agreement or the Correspondent Manual; (ii) the failure of Seller to perform any of its obligations under this Agreement or the Correspondent Manual; (iii) the occurrence of any act of insolvency or bankruptcy concerning Seller; (iv) Seller's failure to meet any capital, leverage, or other financial standard imposed by any applicable regulatory authority, warehouse lender, or in Buyer's sole opinion, any material adverse change occurs in the financial condition of Seller; (v) any federal or state regulatory authority or licensing agency shall cancel, rescind, or fail to renew Seller's license or institute any action against Seller for fraud or criminal conduct.

**15. RIGHT OF OFFSET:** Buyer shall have the right to deduct any penalties, fees, taxes, or other charges or obligations of any kind owed by Seller to Buyer from the amount to be paid for any Mortgage Loan purchased by Buyer hereunder.

**16. ENTIRE AGREEMENT:** This Agreement and the Correspondent Manual contain the entire agreement of the parties with respect to the subject matter hereof, and there are no representations, inducements, or other provisions other than those expressed in writing and included herein. All changes, addendum, additions, or deletions to this Agreement must be made in writing and signed by each of the parties hereto. This Agreement restates, and supersedes any and all prior Mortgage Purchase Agreements between the parties.

**17. SURVIVAL OF PROVISIONS; SEVERABILITY:** All of the covenants, agreements, representations and warranties made herein by the parties hereto shall survive and continue in effect after the termination of the Agreement or the consummation of the transactions contemplated hereby. Any provisions of the Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidation of the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. This Agreement may be executed in counterparts, all of which taken together shall constitute one and the same instrument.

**18. ASSIGNMENT:** This Agreement may not be assigned or transferred by Seller without the prior written consent of Buyer.

**19. AMENDMENT/TERMINATION:** Buyer shall have the right to amend this Agreement with written notice to the Seller. At Buyer's request, Seller shall acknowledge changes to the Agreement in writing, but Seller's failure to provide written acknowledgment of any amendment shall not impair the enforceability of such amendment. This Agreement may also be terminated with respect to future purchases of Mortgage Loans by either party at any time by giving written notice of termination to the other party. Upon the occurrence of any Event of Default as described in Paragraph 15(i), 15(ii), 15(iv) or 15(v) hereof, Buyer may either terminate this Agreement upon notice to Seller or, without affecting any other rights or remedies available to Buyer under this Agreement or at law or in equity, immediately suspend all registrations and lock-ins and may refuse to fund any or all Mortgage Loans, pending the cure, to Buyer's satisfaction, of such Event of Default. Upon the occurrence of an Event of Default under Paragraph 15(iii), this Agreement shall terminate automatically. Termination of this Agreement shall not in any respect change, alter, or modify the obligations of Buyer and Seller with respect to Mortgage Loans that have been purchased by Buyer from Seller prior to the date of such termination.

**20. Governing Law; Waiver of Jury Trail; Dispute Resolution:**
a) The Agreement shall be governed by and interpreted in accordance with the laws of the State of California applicable to agreements entered into and wholly performed within said jurisdiction.
b) EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.
c) Any dispute, claim, or controversy arising out of or relating to the Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in the city of San Bernardino, California as set forth in the Guide.

**·21. WAIVER:**

No waiver of any term or condition of the Agreement shall be effective unless made in writing and signed by the party against whom enforcement of such waiver is sought, and no written waiver shall be deemed or construed to be a waiver of any future or subsequent breach of the term or condition so waived. No failure or delay by either party in exercising any right, power or remedy with respect to any of its rights hereunder shall operate as a waiver thereof.

**22. CONFIDENTIALITY:**

a) Confidential Information. Each party hereto (as "Recipient") may have access to and each party hereto (as "Owner") may provide to the other party, information that Owner regards as confidential or proprietary. "Confidential Information" includes, but is not limited to, the following information, whether now in existence or hereafter created: (a) any and all information of or about OAKTREE FUNDING's customers of any nature whatsoever, and specifically including without limitation, the fact that someone is a customer or prospective customer of OAKTREE FUNDING or Facility, all lists of customers, former customers, applicants and prospective customers and all personal or financial information relating to and identified with such persons ("Customer Information"); (b) all business, financial, technical, and pricing information of Owner and any of Owner's vendors; (c) Owner's marketing philosophy and objectives, promotions, markets, materials, financial results, technological developments and other similar proprietary information and materials; (d) all information marked as "confidential" or similarly marked, or information that Recipient should, in the exercise of reasonable business judgment, recognize as confidential; and (e) all notes, memoranda, analyses, compilations, studies and other documents, whether prepared by Owner, Recipient or others, which contain or otherwise reflect Confidential Information. Without limitation the terms of this Agreement and shall be Confidential Information of OAKTREE FUNDING.

b) Exceptions. Except for Customer Information, the term "Confidential Information" excludes any portion of such information that Recipient can establish to have been: (a) publicly known without breach of this Master Agreement; (b) known by Recipient without any obligation of confidentiality, prior to disclosure of such Confidential Information; (c) received in good faith from a third-party source that to Recipient's reasonable knowledge rightfully disclosed such information; or (d) developed independently by Recipient without reference to Owner's Confidential Information. If Recipient is required by a court or governmental agency having proper jurisdiction to disclose any Confidential Information, Recipient must promptly provide to Owner notice of such request to enable Owner to seek an appropriate protective order.

c) Security and Use. Each party must establish and maintain data security policies and procedures designed to ensure the following: (a) security and confidentiality of Customer Information; (b) protection against anticipated threats or hazards to the security or integrity of Customer Information; and (c) protection against the unauthorized access or use of Customer Information. Confidential Information must be held in confidence and disclosed only to those employees or agents whose duties reasonably require access to such information. Recipient may use the Confidential Information only as necessary for Recipient's performance hereunder. Recipient must protect Owner's Confidential Information using at least the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, disclosure or duplication (except as required for backup systems) of such Confidential Information as Recipient uses to protect its own confidential information of a similar nature. Recipient's limited right to use the Confidential Information expires upon expiration or termination of this Agreement for any reason. Recipient's obligations of confidentiality and non-disclosure survive termination or expiration for any reason of this Agreement.

d) Return or Destruction. Recipient is required to develop appropriate security measures for the proper disposal and destruction of Confidential Information. Upon expiration of Recipient's limited right to use the Confidential Information, Recipient must return all physical embodiments thereof to Owner or, with Owner's permission, Recipient may destroy the Confidential Information (except for any backups thereof).

e) Disclosure. If disclosure of Confidential Information to third parties is required or allowed under this Master Agreement, Recipient must ensure that such third parties have express obligations of confidentiality and non-disclosure substantially similar to Recipient's obligations hereunder. Liability for damages because of disclosure of Confidential Information by any such third parties must be borne by Recipient. If Recipient or any of its representatives or agents breaches the covenants set forth in this Master Agreement as to Confidential Information, irreparable injury may result to Owner or third parties entrusting Confidential Information to Owner. Therefore, Owner's remedies at law may be inadequate and Owner shall be entitled to seek an injunction to restrain any continuing breach. Notwithstanding any limitation on Recipient's liability, Owner shall further be entitled to any other rights and remedies that it may have at law or in equity.

f) Security Breach. If there is any actual or suspected theft of, accidental disclosure of, loss of, or inability to account for any Confidential Information by Recipient and/or any unauthorized intrusions into Recipient's facilities or secure systems (collectively "Security Breach"), Recipient must immediately (a) notify Owner (b) estimate the Security Breach's effect on Owner (c) specify the corrective action to be taken, and (d) investigate and determine if an Security Breach has occurred. If, based upon Recipient's investigation, Recipient determines that there has been an actual Security Breach, Recipient must promptly notify Owner and must promptly investigate the scope of the Security Breach, and must promptly take corrective action to prevent further Security Breach. Recipient must, as soon as is reasonably practicable, make a report to Owner including details of the Security Breach (including Customer(s)' identities and the nature of the information disclosed) and the corrective action Recipient has taken to prevent further Security Breach. Recipient must, in the case of a Security Breach, cooperate fully with Owner to notify Owner's Customer(s) as to the fact of and the circumstances of the Security Breach of the Customer's particular information. Additionally, Recipient must cooperate fully with all government regulatory agencies and/or law enforcement agencies having jurisdiction and authority for investigating a Security Breach and/or any known or suspected criminal activity. Except as may be strictly required by applicable law, Recipient agrees that it will not inform any third party of any such Security Breach without Owner's prior written consent; however, if such disclosure is required by applicable law, Recipient agrees to work with Owner at no additional cost to Owner regarding the content of such disclosure.

23. **AGREEMENT TO PAY ATTORNEYS' FEES:** If it is determined in a judicial proceeding that the Seller has failed to perform under any provision of this Agreement or if the Buyer shall employ attorneys or incur other expenses for the enforcement, performance, or observance of the terms of this Agreement on the part Seller, then the Buyer shall be reimbursed by the Seller on demand for reasonable attorneys' fees and other out-of-pocket expenses.

**Oaktree Signature Page**

**IN WITNESS WHEREOF**, the Purchaser and the Seller have caused this Mortgage Loan Purchase and Sale Agreement to be executed as of the day and year first above written.

PURCHASER:                              SELLER:  Resmac Inc.
Oaktree Funding Corp.

By: *Stephen Lippens*                    By: _____

Name:  Stephen Lippens                   Name:  JJ Zhang

Title:  Co-CEO                           Title:  Vice President

1    **<u>DEMAND FOR JURY TRIAL</u>**

2         Plaintiff, RESMAC, INC., hereby demands a jury trial.

3    Dated:  November 11, 2025              THE WESTMORELAND LAW FIRM, P.C.

4
                                        /s/ Dominique N. Westmoreland
5                                  By: _____
6                                      Dominique N. Westmoreland
                                       Yesha H. Patel
7                                      Attorneys for Plaintiff,
                                       RESMAC, INC.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 13 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL